IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KATHERINE J.,[1]                                          No. 1:19-cv-00474-HZ

                         Plaintiff,                      OPINION & ORDER

            v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                         Defendant.


James Hunt Miller
P.O. Box 10891
Oakland, CA 94610

        Attorney for Plaintiff


Renata Gowie
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case.

L. Jamala Edwards
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff Katherine J. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits ("DIB"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court reverses the Commissioner's decision and remands this case for further administrative proceedings.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB on February 11, 2015, alleging an onset date of April 1, 2012. Tr. 67.[2] Plaintiff's date last insured ("DLI") is September 30, 2017. Tr. 67. Her application was denied initially and on reconsideration. Tr. 98, 104.

     On August 8, 2017, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 38. On January 11, 2018, the ALJ found Plaintiff not disabled. Tr. 31.  The Appeals Council denied review. Tr. 1.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on "right knee injury, . . . injured right and left upper forearms, PTSD, chronic pain, sleep problems, anxiety, [and] difficulty concentrating[.]" Tr. 204. At the time of her alleged onset date, she was 54 years old. Tr. 67. She has past relevant work experience as a clerical assistant and court clerk. Tr. 30.

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 13.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to

the Commissioner. In step five, the Commissioner must establish that the claimant can perform

other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f). If the

Commissioner meets [his/her] burden and proves that the claimant can perform other work that

exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566,

416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity after her alleged onset date through her DLI. Tr. 22. Next, at steps two and three, the

ALJ determined that Plaintiff has the following severe impairment: "right knee arthropathy." Tr.

23. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal

the severity of a listed impairment. Tr. 24. At step four, the ALJ concluded that Plaintiff has the

residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) with

the following limitations: "sit 50% of the workday, never climb ramps, stairs, ladders, ropes, or

scaffolds; frequently balance; occasionally stoop and crawl, but never kneel or crouch. And

avoid uneven ground." Tr. 24. Because of these limitations, the ALJ concluded that Plaintiff

could perform her past relevant work as a "clerical assistant" and "court clerk." Tr. 30. Thus, the

ALJ concluded that Plaintiff is not disabled. Tr. 30.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings "are based on legal error or are not supported by substantial evidence

in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal

quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) discounting Plaintiff's subjective symptom testimony; (2) discounting the opinions of examining and treating medical providers Dan Sands, Ph.D.; Albert Kastl, Ph.D.; Kai Mazur, M.D.; and Gary Stein, M.D.; (3) finding Plaintiff's anxiety and wrist impairments "non-severe" at step two; and (4) failing to include all of Plaintiff's limitations in the RFC at step four. Because the ALJ erred in rejecting Plaintiff's subjective symptom testimony and medical evidence as to her physical impairments, the Court remands this case for further proceedings.

## I.     Subjective Symptom Testimony

Plaintiff argues that the ALJ erred in evaluating her subjective symptom testimony. The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering,

"where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on clear and convincing reasons") (quotation marks and citation omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (the ALJ engages in a two-step analysis for subjective symptom evaluation: First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (quotation marks and citations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

Plaintiff last worked in 2012 as a court service technician. Tr. 226. She stopped working due to knee and arm injuries sustained in 2011. In the spring of 2011, she tripped and injured her knee. Tr. 708. Months later—and only days before her first knee surgery—an elevator door

"slammed" on her arm. Tr. 51. Her injuries "threw her whole life in a loop" because she could no longer do the things that she used to. Tr. 51. To treat her conditions, Plaintiff takes narcotic pain medications and uses medical marijuana. She gets sleepy and cannot drive or "function" when she takes her pain medication. Tr. 49–50. She takes it only when her pain gets to the point where she needs it, in the evening three or four times a week. Tr. 50. She uses medical marijuana to help her sleep. Tr. 50. Plaintiff also experiences anxiety and depression and cries forty-five minutes to an hour every day when she is depressed. Tr. 51–52. She feels worthless because she cannot do anything. Tr. 52.

In her function report, Plaintiff wrote that she begins her day by taking care of her personal needs, eating breakfast, and feeding her animals. Tr. 239. She spends the day grocery shopping, going to doctor appointments for herself or her husband, and doing light housework or gardening. Tr. 239. In the evening, she eats dinner, watches television, and goes to bed. Tr. 239. Plaintiff's husband is disabled, so she helps take care of him by cooking light meals, doing laundry, and assisting with paperwork. Tr. 45, 239. She also cares for their cats, dogs, and goldfish when she is not in too much pain. Tr. 239. Otherwise, her husband helps care for their pets. Tr. 239. She has some limitations in her ability to care for her personal needs, including putting on shoes, caring for her hair, and pulling on her socks. Tr. 239. Though she can make soups, salads, and other dishes, she cannot lift heavy pots or stir sauces. Tr. 240. Light house and yard work—like surface cleaning and watering the garden—take her all day once a week. Tr. 240. She shops for groceries, personal needs, and gifts one or two times per week for about an hour or a half. Tr. 241. Before her illnesses, she could pick up her grandchildren, do heavy gardening, hike, go rockhounding, run, and go up and down stairs. Tr. 239. She also enjoys riding horses, bird watching, reading, dancing, and spending time at the beach. Tr. 242. But there

are "things [she] can no longer do since [her] injury," like hiking, dancing, and heavy gardening. Tr. 242, 245. She requires easy access to the beach, birdwatches from the car, and cannot walk on uneven surfaces. Tr. 242. Plaintiff does not feel comfortable going out a lot. Tr. 243.

At the hearing, Plaintiff testified that she can drive for short periods of time. Tr. 46. She said that she occasionally goes to the store alone, but most of the time her husband goes with her and does all the driving. Tr. 51. Though her husband is physically disabled, he does all the heavy housework like mopping, vacuuming, and heavy lifting. Tr. 53. Sometimes, her arms ache and her husband has to help her with activities like brushing her hair and getting up from the couch. Tr. 53–54. They help each other in the areas that they can. Tr. 54. She used to go to lunch with friends from the court, but she stopped because it made her too anxious and sad. Tr. 55. Family and friends visit her. Tr. 54–55.

Because of Plaintiff's physical impairments, she cannot kneel, climb or descend stairs, grasp, push, pull, crawl, walk on uneven surfaces, keyboard over forty-five minutes, lift over five pounds on each arm or fifteen pounds total, crouch on one knee, do repetitive functions, stand or walk over twenty minutes, and sit for thirty minutes. Tr. 238. Some of her limitations vary depending on her pain level that day. Tr. 243. Plaintiff testified that if she walks more than fifteen or twenty minutes or does light housekeeping, she needs to lie down and rest because of her pain. Tr. 55. Plaintiff does not need reminders or have trouble managing money. Tr. 240–41. But she wrote that she has to constantly reread written directions and take notes to remember spoken instructions. Tr. 243. Plaintiff's illnesses interrupt her sleep. Tr. 239. Loud noises jolt her awake, and she has pain when she turns in bed to move her body. Tr. 239. Plaintiff does not handle stress or changes in routine well, and elevators cause her anxiety. Tr. 244.

The ALJ gave three reasons for discounting Plaintiff's subjective symptom testimony. First, the ALJ found that Plaintiff's allegations are inconsistent with her activities of daily living. Tr. 29. Second, the ALJ concluded that Plaintiff has received generally conservative care for both her mental and physical impairments. Tr. 29. Third, the ALJ found that the objective evidence was "mild to moderate." Tr. 29.

A.    Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti*, 533 F.3d at 1039. There are two grounds for using daily activities to form the basis of an adverse credibility determination: (1) when activities meet the threshold for transferable work skills and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007). However, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," *Reddick*, 157 F.3d at 722, and "the mere fact that a plaintiff has carried on with certain daily activities, such as grocery shopping . . . does not in any way detract from his credibility," *Webb v. Barnhart,* 433 F.3d 683, 688 (9th Cir. 2005) (citing *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir.2001)). In order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick,* 157 F.3d at 722. The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to reach his conclusion on the claimant's credibility. *Id.* at 722–23.

The ALJ concluded that Plaintiff's allegations were inconsistent with Plaintiff's activities of daily living. Tr. 29. She noted that Plaintiff "has a generally good function report" and "loves gardening, reading, walking on the beach, rock hunting and agate hunting." Tr. 29 (citing tr. 728). The ALJ emphasized that Plaintiff watches television and movies, can manage her finances, does not need reminders, drives, cares for her pets, performs light housework, shops,

cares for her personal needs, goes out to eat, and attends her grandson's baseball games. Tr. 29.

The ALJ also cited a statement to a medical provider that she drove to Sacramento with her

husband and looked up events to go to, such as a rodeo. Tr. 29 (citing tr. 360). Finally, the ALJ

observed that "[a]lthough [Plaintiff] has reported that her husband does most of the housework

this is inconsistent with [Plaintiff]'s husband having a physical disability." Tr. 29.

As a preliminary matter, the ALJ did not state what testimony was inconsistent with

Plaintiff's activities of daily living. Nor is the Court able to discern the ALJ's reasoning from the

remainder of the ALJ's decision as she never summarizes or otherwise discusses Plaintiff's

testimony. For this reason alone, the ALJ's finding is not clear or convincing. *See Reddick v.

Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("General findings are insufficient; rather, the ALJ

must identify what testimony is not credible and what evidence undermines the claimant's

complaints.").

Further, Plaintiff's limited activities of daily living are not inconsistent with her

testimony. Many of the cited activities are more limited than the ALJ suggests.[3] For example,

Plaintiff testified that she can drive and go out by herself, but her husband usually does the

driving and goes out with her. Tr. 51. During long car rides, she may have to stop and stretch to

manage her pain. Tr. 245. For example, when she and her husband drove two hours to

Sacramento, she took two or three rest stops. Tr. 360. She has limited social interactions. Tr. 55.

Plaintiff can cook simple meals, attend doctor appointments, and "see [her] grandson's games

---

[3] The ALJ also referenced Plaintiff's interest in various hobbies and research into events to
attend in Reno. Tr. 29. However, there is no evidence in the record that Plaintiff engaged in or
continues to engage in these activities. Indeed, Plaintiff described limitations in her hobbies due
to her impairments in her function report. Tr. 242, 245. And Plaintiff merely told a medical
examiner that she will spend part of her day "on the internet to review various events that may be
of interest to her and her husband." Tr. 360.

sometimes." Tr. 242. Her hobbies are more limited than they used to be. Tr. 242. Plaintiff can no

longer hike or dance, she birdwatches from her car, and she needs easy access to the beach. Tr.

242, 245. Plaintiff only does light housekeeping, and at times she has to ask her husband for help

with her personal needs. Tr. 53. And none of these activities are necessarily inconsistent with

Plaintiff's allegations. Plaintiff testified that she struggles with sleep, has anxiety around

elevators and stairs, and cries for forty-five minutes to an hour every day. Tr. 50–52. Plaintiff

cannot lift more than fifteen pounds. Tr. 54. She has to rest and lie down due to pain after doing

light housekeeping, watering the lawn, or walking more than 15 or 20 minutes. Tr. 55. She wrote

in her function report that she has difficulty kneeling; climbing and descending stairs; grasping,

pulling, pushing; crawling, walking on uneven surfaces; keyboarding; crouching; repetitive

functions; and standing or walking for more than twenty minutes or sitting for more than thirty

minutes. Tr. 238. Accordingly, the ALJ erred in this finding.[4]

> B.    Conservative Treatment

The Ninth Circuit has "long held that, in assessing a claimant's credibility, the ALJ may

properly rely on 'unexplained or inadequately explained failure to seek treatment or follow a

prescribed course of treatment,'" *Molina*, 674 F.3d at 1113 (quoting *Tomasetti*, 533 F.3d at

1039), as well as evidence of conservative treatment, *see Parra v. Astrue*, 481 F.3d 742, 751 (9th

Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's

---

[4] In its response, the Commissioner appears to suggest that Plaintiff's activities may meet the
threshold for transferable work skills. Def. Br. 11–12. But the ALJ did not conclude that
Plaintiff's activities meet the threshold for transferable work skills. A district court cannot affirm
the Commissioner's decision on grounds the ALJ did not invoke. *Burrell v. Colvin*, 775 F.3d
1133, 1141 (9th Cir. 2014) (citations omitted); *see also Trevizo v. Comm'r*, 871 F.3d 664, 677
n.4 (9th Cir. 2017) (holding that the district court erred in looking beyond the ALJ's stated
reasons and explanation to support the ALJ's opinion). Thus, the Court cannot rely on the
Commissioner's post-hac rationalizations.

testimony regarding severity of an impairment."). But the Ninth Circuit has cautioned that individuals with mental health impairments should not be penalized for exercising "'poor judgment in seeking rehabilitation.'" *See Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir.1999) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).

The ALJ found that Plaintiff "has received generally conservative care for her impairments." Tr. 29. She noted that Plaintiff has not had any ongoing psychological counseling or medication and "considered that [Plaintiff] did not have any admission or intensive outpatient therapy for mental health." Tr. 29–30. With regard to Plaintiff's physical impairments, the ALJ emphasized that Plaintiff "has had no extensive pain management" and declined injections and pain medications beyond marijuana and occasional Norco. Tr. 29.

As to Plaintiff's mental health conditions, the Court agrees with the ALJ's findings. Despite Plaintiff's allegations of debilitating PTSD, depression, and anxiety, there is little mental health treatment in the record. In 2012 and 2014, Plaintiff saw Albert Kastl, Ph.D., for evaluations related to her workers compensation claim. Tr. 338–90. Plaintiff also saw Dan Sands, Ph.D., for psychotherapy between December 2014 and March 2015.[5] *See* tr. 395–400. Plaintiff has not taken medications for her psychological impairments and has not had ongoing psychotherapy. *See* tr. 350 (recommending Plaintiff receive medical treatment for her mental health and noting that "[s]he declines the use of psychiatric medications"), 369 (recommending treatment). In light of this treatment record, the ALJ did not err in discounting Plaintiff's

---

[5] Dr. Sands's report suggests that he saw Plaintiff through 2016. Tr. 573. However, there are only records for five visits between December 2014 and March 2015 in the record. Tr. 395–400. At the hearing, Plaintiff's counsel confirmed that these were the complete treatment records from Dr. Sands. Tr. 42.

testimony as to her mental impairments due to her conservative treatment history. *See Shelly A.O. v. Comm'r, Soc. Sec. Admin.*, No. 3:18-cv-02158-HZ, 2020 WL 3868504, at *7 (D. Or. July 8, 2020) (affirming the ALJ's rejection of the plaintiff's mental health testimony because the plaintiff received only conservative treatment where the plaintiff did not receive regular counseling but was prescribed prescription medication).

As to Plaintiff's physical impairments, however, the Court finds that the ALJ erred. Treatment for Plaintiff's knee was not conservative. Though the ALJ is correct that Plaintiff declined injections in her knee, she was prescribed narcotic pain medication to manage her pain and underwent two knee surgeries. Tr. 505, 511–12, 527, 741. After her second surgery and twelve visits of physical therapy, Dr. Stein wrote that Plaintiff would likely have permanent restrictions due to her knee pain. Tr. 527. Treatment for Plaintiff's arm was more conservative, but Plaintiff exhausted all her options. After receiving an injection for her arm pain—which provided Plaintiff with only temporary relief—Plaintiff declined further injections. Tr. 428, 430. Dr. Mazur noted that Plaintiff's right arm pain had failed to respond to conservative treatment but expressed concerns that symptoms may worsen with surgical release of the radial tunnel. Tr. 436. In his final disability evaluation and report, Dr. Mazur wrote that her recovery had plateaued with conservative treatment modalities, her condition did not warrant surgical intervention, and she was at maximum medical improvement to be considered "permanent and stationary." Tr. 522. Plaintiff also took Vicodin to treat her arm pain. Tr. 448, 452. *See Vogel v. Colvin*, No. ED CV 15-166-E, 2015 WL 12748243, at *2 (C.D. Cal. Sept. 11. 2015) (citing cases and finding injections, narcotic pain medications, and recommendations that a claimant undergo surgery may not be conservative); *Lapierre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) ("A claimant cannot be discredited for failing to pursue non-conservative treatment

options where none exist."). Thus, substantial evidence does not support the ALJ's conclusion that Plaintiff's treatment for her physical impairments has been conservative.

     C.     Objective Medical Evidence

The ALJ is instructed to consider objective evidence in considering a claimant's symptom allegations. 20 C.F.R. § 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms[.]"). Inconsistency between Plaintiff's testimony and the objective medical record is a valid reason to discount Plaintiff's testimony. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (affirming the ALJ's credibility finding when the plaintiff's testimony of weight fluctuation was inconsistent with the medical record). And in some cases, the ALJ can discount claimant testimony when that testimony is not supported by the objective medical record. *See Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2007) ("'Graphic and expansive' pain symptoms could not be explained on objective, physical basis by claimant's treating physician."); *Burch*, 400 F.3d at 681 (The ALJ could consider mild findings on MRIs and X-rays in discounting the plaintiff's testimony as to her back pain.). But this may not be the ALJ's sole reason for discounting a claimant's testimony: "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick*, 157 F.3d at 722.

In discounting Plaintiff's testimony, the ALJ determined that "[t]he objective medical evidence is considered only mild to moderate," citing "multiple normal physical exams." Tr. 29. She also found that the "record does not include ongoing complaints of crying for an hour . . . daily or even regularly." Tr. 30.

The ALJ did not err in finding that the treatment record does not support Plaintiff's symptom testimony as to her mental impairments. There is little medical evidence to support her testimony. The five or so treatment notes from Dr. Sands do not reflect Plaintiff's complaints of anxiety except to the extent that she reported trouble sleeping and symptoms of PTSD and anxiety when in small rooms or driving by the courthouse where she used to work. Tr. 398, 397. And the medical opinion evidence from Dr. Sands and Dr. Kastl, as explained below, was reasonably given little weight. *See infra* Part II.A–B.

As to Plaintiff's physical impairments, however, the ALJ erred. Lack of support from the objective medical evidence is the sole remaining reason for discounting Plaintiff's subjective symptom testimony. But this alone cannot serve as the basis for discounting Plaintiff's testimony. *See Reddick*, 157 F.3d at 722. Moreover, the ALJ's reasoning is not supported by substantial evidence. Imaging of Plaintiff's knee revealed a possible meniscal tear, chondromalacia, and prepatellar bursitis. Tr. 331, 469. The first surgery showed an extensively torn posterior medial meniscus. Tr. 731 (noting that "the whole medial and posterior portion of the meniscus was torn and crushed"). The second knee surgery revealed a meniscus cartilage tear; grade I chondromalacia of the patellofemoral, medial, and lateral compartments; and suspicion of previous ACL injury. Tr. 564. An MRI of Plaintiff's forearm from 2013 showed edema in her forearm musculature and mild subluxation of the extensor carpi ulnaris tendon. Tr. 329. Clinical examinations by Plaintiff's physicians also revealed weakness, tenderness with palpation, pain with extension, and limited range of motion in Plaintiff's joints. Tr. 419 (wrist pain with extension against resistance and point tenderness to palpation), 428 (wrist weakness, tenderness, and pain with extension), 454, 457–58 (localized knee swelling and tenderness, pain with range of motion, weakness, antalgic gait, positive McMurray test), 479 (pain elicited throughout range

of motion and a positive McMurray test). Thus, while the ALJ did not err in discounting

Plaintiff's subjective symptom testimony as to Plaintiff's psychological impairments, the ALJ's

rejection of Plaintiff's testimony as to her knee and wrist impairments was not clear, convincing,

or supported by substantial evidence.

## II.    Medical Opinion Evidence

There are three types of medical opinions in social security cases: those from treating,

examining, and non-examining doctors. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). If no

conflict arises between medical source opinions, the ALJ generally must accord greater weight to

the opinion of an examining physician over that of a reviewing physician, *id.*, and more weight is

given to an examining physician than to a nonexamining physician, *see Garrison v. Colvin,* 759

F.3d 995, 1012 (9th Cir. 2014). If a treating or examining physician's opinion is not contradicted

by another physician, the ALJ may reject it only for clear and convincing reasons. *Id.*; *Widmark*

*v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006). Even if one physician is contradicted by

another physician, the ALJ may not reject the opinion without providing specific and legitimate

reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark*, 454

F.3d at 1066. And "[t]he Commissioner may reject the opinion of a non-examining physician by

reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244

(9th Cir. 1998). Here, the specific and legitimate standard applies.[6]

Plaintiff argues that the ALJ erred in rejecting the medical opinion evidence from treating

medical providers Dan Sands, Ph.D.; Albert Kastl, Ph.D.; Kai Mazur, M.D.; and Gary Stein,

M.D. The Court addresses each in turn.

---

[6] The opinions of these physicians conflict with those of the state agency physicians. *See* tr. 67,
84; *Widmark*, 454 F.3d 1066–67.

A.      Dan Sands, Ph.D.

Plaintiff saw Dr. Sands for mental health care for a few months between December 2014 and March 2015.  Dr. Sands completed two mental residual functional capacity questionnaires on April 15, 2016, and September 23, 2016. Tr. 567, 573.

In the first questionnaire, Dr. Sands diagnosed Plaintiff with a mood disorder. Tr. 567. He noted that Plaintiff "responds to support but is not functioning at a level where full-time employment could be resumed." Tr. 567 ("[C]lient needs ongoing supportive psychotherapy. She will not be able to return to full time employment."). Clinical findings included frequent anxiety attacks, nightmares, withdrawal, and isolation. Tr. 567. Signs and symptoms of Plaintiff's condition included anhedonia, weight gain, decreased energy, anxiety, depression, difficulty concentrating, intrusive thoughts, apprehensive expectation, withdrawal, distractibility, intermediate memory impairment, panic attacks, and sleep disturbances. Tr. 568. Dr. Sands found that Plaintiff was unable to meet competitive standards in areas such as remembering work like procedures, maintaining attention and attendance, completing a normal workday and workweek, performing at a consistent pace, dealing with normal work stress, and understanding and remembering detailed instructions. Tr. 569–70. He opined that she has continuing PTSD symptoms of panic attacks, nightmares, and withdrawal and "[a]ny stress tends to provoke occurrence of these symptoms." Tr. 570. Dr. Sands also noted that Plaintiff "has problems dealing with people and places that are unfamiliar due to PTSD." Tr. 570. According to Dr. Sands, Plaintiff has both good and bad days and would be likely to miss more than three days of work per month. Tr. 571.

The September 2016 questionnaire provided similar information. Dr. Sands wrote that Plaintiff had been diagnosed with PTSD. Tr. 573. The clinical findings that demonstrate the

severity of Plaintiff's impairment identified by Dr. Sands are Plaintiff's "failure of confidence due to her injury." Tr. 573. He opined that her prognosis is poor. Tr. 573. Dr. Sands again identified many of the same signs and symptoms as in his April assessment. Tr. 574. This time, Dr. Sands found that Plaintiff was only "seriously limited but not precluded" in most of her mental abilities and aptitudes, noting that Plaintiff has "limitations across the board due to anxiety and depression stemming from PTSD." Tr. 575–76. He also found she was unable to meet competitive standards in setting realistic goals or making plans independently of others. Tr. 576. Dr. Sands noted "[s]he has grossly low self-esteem and self-confidence even for personal activities." Tr. 576.

The ALJ gave Dr. Sands' assessment little weight. Tr. 27. She concluded that there was "no explanation nor any supporting treatment notes." Tr. 27. She also noted that Plaintiff did not see this provider until 2015. Tr. 27. Finally, she found the opinion was inconsistent with other opinions in the record, and it was inconsistent with Plaintiff's activities generally. Tr. 27.

The ALJ's reasoning was specific and legitimate. Dr. Sands's opinions are not adequately explained or supported by the treatment notes. As described above, the five treatment notes in the record—from appointments nearly a year prior to Dr. Sands's completion of the questionnaires—do not provide support for the limitations described by Dr. Sands. In these appointments, Plaintiff describes symptoms of PTSD when she drives by the courthouse where she used to work and when she is in relatively small rooms. Tr. 398. Her reported symptoms include insomnia, palpitations, flashbacks, and dizziness. Tr. 397–98. There is no support in the treatment notes for the other symptoms described, such as anxiety attacks, nightmares, isolation, fatigue, difficulty concentrating, or issues with her memory. Nor is there support for some of the limitations described, including understanding instructions, remembering work procedures, and

maintaining attention and attendance. Though the ALJ does not provide sufficient support for his conclusions that Dr. Sands's opinions are inconsistent with Plaintiff's activities and the other medical opinions, this reason alone is sufficient to discount Dr. Sands's opinion. Accordingly, the ALJ did not err in giving Dr. Sands's assessments little weight.

       B.     Albert Kastl, Ph.D.

Dr. Kastl performed two medical evaluations as part of Plaintiff's workers' compensation claim. The first evaluation was completed on July 26, 2012. Tr. 338. As part of the report, Dr. Kastl reviewed and summarized Plaintiff's medical records through that date. Tr. 338–41. He also provided a history of Plaintiff's injury, a summary of her present complaints, and a social and work history Tr. 341–46. Dr. Kastl performed a mental status examination and associated testing. Tr. 346. Plaintiff scored in the severe range of the Beck Depression Inventory, the severe range on the Beck Anxiety Inventory, and tested "well within the range of post-traumatic stress disorder as compared to other clinical conditions" on the Penn Inventory for Post-Traumatic Stress Disorder. Tr. 346–47. She had average memory and concentration. Tr. 347. There was no indication of any attempt to malinger or exaggerate. Tr. 348.

Dr. Kastl determined that Plaintiff's Axis I diagnosis was PTSD as a result of the workplace elevator injury to her forearms. Tr. 348. He specifically noted Plaintiff's experience of distressing recollections and dreams, intense psychological distress at exposure to cues that resemble the event, avoidance of stimuli associated with the trauma, fear, sleep disturbance, irritability, and hypervigilance. Tr. 348. Dr. Kastl concluded that, at the time of his report, Plaintiff was in a period of temporary partial disability on a psychiatric basis and needed further medical treatment. Tr. 350. He noted that she declined the use of psychiatric medications and

recommended she pursue psychological treatment, including weekly psychotherapy for a twenty-session course of treatment and reevaluation. Tr. 350.

Dr. Kastl conducted the second evaluation on April 14, 2014, almost two years later. Tr. 353. Dr. Kastl's second evaluation included an updated summary of her workplace injury and medical records. Tr. 353–57. He also included an updated mental status exam and testing, showing "significant improvements" in Plaintiff's anxiety, depression, and PTSD symptoms. Tr. 363. She continued to show average memory, attention, and concentration. Tr. 363. In this report, Dr. Kastl assessed Plaintiff's level of impairment in different areas of functioning. Tr. 366. He found she had a moderate to marked impairment in activities of daily living; a mild to moderate impairment in social functioning; a moderate impairment in concentration, persistence, and pace; and an extreme impairment in her ability to adapt to stress. Tr. 366–67. Dr. Kastl noted some dispute between Plaintiff and one of the attorneys as to whether she had been offered psychiatric care or attempted to avail herself of such services. *Compare* tr. 354 (attorney reporting that Plaintiff had been offered psychiatric care repeatedly but had not availed herself of that option) *with* tr. 357 (reporting to Dr. Kastl that she had not been offered mental health services until the end of March 2014 but was awaiting the opportunity to avail herself of such services). He also continued to opine that additional medical treatment—specifically weekly psychotherapy visits for twenty sessions—was necessary. Tr. 369. He concluded that as of the date of the second evaluation Plaintiff was considered "permanent and stationary." Tr. 369.

The ALJ gave only partial weight to Dr. Kastl's 2014 assessment. Tr. 27. First, the ALJ found that the psychological limitations are not supported longitudinally. Tr. 27. Second, the ALJ found that Plaintiff "had minimal mental health treatment and the longitudinal record does not support completes [sic] of weekly breakdowns." Tr. 27.

The ALJ's reasoning for rejecting Dr. Kastl's opinion is specific and legitimate. *See Tommasetti v.* Astrue, 533 F.3d 1035, 1041 (9th Cir. 2014) (affirming the ALJ's rejection of a questionnaire completed by the plaintiff's treating physician because the medical records did not provide support for the limitations assessed by the physician). Despite the recommendations of Dr. Sands and Dr. Kastl, Plaintiff has had little psychiatric treatment.  She does not take any medication for her mental health conditions. In the medical records that were reviewed by Dr. Kastl as part of his 2012 and 2014 psychiatric evaluations, there is little support for Dr. Kastl's assessments of severe depression, anxiety, PTSD, or their associated symptoms. For example, there is no support for Plaintiff's reported symptoms of memory issues, weekly breakdowns, irritability, and hypervigilance in the medical record.

Plaintiff also argues that the ALJ erred by addressing only the 2014 report and not discussing the 2012 report. However, the reasons that the ALJ offered for rejecting the 2014 opinion apply equally to the 2012 opinion. *See Hollingsworth v. Colvin*, No. 3:12-cv-05643-BHS-KLS, 2013 WL 3328609, at *5 (W.D. Wash. July 1, 2013) (citing *Molina*, 674 F.3d at 1116–17) (finding the ALJ's error in failing to address a physician's opinion harmless where the reason for rejecting a similar opinion applied equally well to the physician's opinion). Accordingly, the Court finds that the ALJ did not err in her assessment of Dr. Kastl's opinion.

C.      Kai Mazur, M.D.

Dr. Mazur regularly saw Plaintiff for her arm injury between 2012 and 2015. Tr. 418–547. In April 2012, Dr. Mazur diagnosed Plaintiff with: (1) Right mild carpal tunnel syndrome; (2) rule out right radial tunnel syndrome status post blunt contusion, radial forearm; and (3) left forearm pain. Tr. 420. Throughout his treatment of Plaintiff's injury, Dr. Mazur found various restrictions on Plaintiff's ability to use her right arm. In April 2012, he recommended that she

"avoid any forceful gripping or pushing, pulling or lifting over 10 pounds with the right upper extremity." Tr. 420. The next month, he continued to recommend Plaintiff avoid lifting over ten pounds and instructed her not to forcefully pull medical records with the right and stretch her arm every forty-five minutes. Tr. 424. In August 2012, Dr. Mazur recommended she avoid any forceful torquing or grasping activities. Tr. 432. In April 2013, he stated that Plaintiff should "avoid lifting, pushing or pulling more than 15 pounds." Tr. 452, 522 (December 2013 note that she should not lift over fifteen pounds). At the end of 2013, Dr. Mazur opined that Plaintiff had plateaued using conservative treatment modalities but surgical intervention was not warranted. Tr. 522. Thus, he recommended she be considered "permanent and stationery, i.e. maximal medical improvement." Tr. 522, 546.

The ALJ gave reduced weight to the opinion of Dr. Mazur. Tr. 27. The ALJ found that Dr. Mazur's assessments were "inconsistent with the physical examination findings reflecting that the claimant had full range of motion in the elbows and wrists and a negative Finkelstein's test." Tr. 27–28. This reason is neither specific nor legitimate. The tests cited by the ALJ were just a few of many physical examinations conducted by Dr. Mazur to assess Plaintiff's right forearm pain, many of which provide support for Dr. Mazur's findings. For example, at one of Plaintiff's first appointments with Dr. Mazur, Plaintiff had pain with wrist extension against resistance, point tenderness to palpation, and possible deep swelling. Tr. 419. A few months later, Dr. Mazur noted weakness on exam, pain with extension, and tenderness in the radial tunnel. Tr. 428; *see also* tr. 436 (point tenderness and weakness), 474 (pain and tenderness in radial tunnel and with wrist extension). In light of the objective medical evidence and Dr. Mazur's observations, Plaintiff's full range of motion in her elbows and wrists and negative Finkelstein's test are not specific and legitimate reasons to give reduced weight to the opinion of

Dr. Mazur. Accordingly, the ALJ erred in rejecting Dr. Mazur's assessed limitations related to Plaintiff's right forearm impairment.

       D.       Gary Stein, M.D.

Dr. Stein treated Plaintiff for her knee impairment between April 2013 and December 2015. Tr. 454–553. On September 19, 2016, Dr. Stein completed a Lower Extremity Residual Functional Capacity Questionnaire. Tr. 579. Dr. Stein wrote Plaintiff's diagnoses were "chronic knee pain, internal derangement, and residual weakness." Tr. 579. The clinical findings supporting Dr. Stein's diagnoses include tenderness to palpation and discomfort with weight bearing activities. Tr. 579. Symptoms include right knee pain, weakness, and inability to kneel, climb, squat, and walk on uneven ground. Tr. 579. Dr. Stein identified tenderness and muscle weakness as objective signs of Plaintiff's knee impairments. Tr. 580. He opined that Plaintiff's pain would be severe enough to interfere with Plaintiff's attention and concentration frequently. Tr. 580. According to Dr. Stein, Plaintiff can sit for one hour at a time before needing to get up and stand thirty minutes at a time before needing to sit or walk. Tr. 581. She can sit for two hours and stand or walk for less than two hours in an eight-hour workday. Tr. 581. Dr. Stein opined Plaintiff would need a job that allowed her to shift positions from sitting, standing, or walking at will, and take unscheduled breaks every hour during an eight-hour workday. Tr. 581. She can also never stoop, crouch or squat, climb ladders, or climb stairs. Tr. 582.

At a June 2015 post-operative appointment, Dr. Stein assessed Plaintiff with "[i]nternal derangement of medial meniscus of knee- post op." Tr. 551. He noted that Plaintiff still had knee pain, soreness, and residual weakness. Tr. 551. He opined that Plaintiff "is permanent and stationary with maximum medical improvement" and "will likely have permanent restrictions

precluding her from kneeling, climbing and squatting with allowance for her to be sitting 50% of the work day and avoidance of walking on uneven ground." Tr. 551.

The ALJ gave Dr. Stein's opinions little weight. Tr. 28. First, the ALJ rejected Dr. Stein's opinions as to Plaintiff's disability as "a subject matter reserved to the commissioner." Tr. 28 (citing 20 C.F.R. § 404.1527(d), (e)).  She also noted that Dr. Stein's opinions contained minimal explanation, were based on a checkbox form, and were unsupported by the treatment notes. Tr. 28. The ALJ again referred to Plaintiff's "generally conservative care" and noted that Dr. Stein had "never instructed the claimant to limit herself in these ways." Tr. 28. Separately, the ALJ addressed Dr. Stein's June 10, 2015 chart notes finding that the claimant was maximum improvement and describing various limitations Tr. 28. The ALJ gave this assessment partial weight, finding that less restrictive limitations were warranted considering Plaintiff's "considerable activities of daily living." Tr. 28.

First, the ALJ erred in finding that Dr. Stein's opinions are unsupported by treatment notes. Though an ALJ can reject a check-box opinion that is unsupported or unexplained, Dr. Stein's opinion was supported by two and a half years of treatment notes. *See Garrison*, 759 F.3d at 1013 (finding the ALJ erred by failing to recognize that the check-box form was based on significant experience with the plaintiff and numerous records, and therefore entitled to greater weight than it otherwise would be). Dr. Stein observed objective signs of Plaintiff's knee impairment, including pain with range of motion, localized swelling and tenderness, a positive McMurray test, weakness in her knee, and an antalgic gait. Tr. 457–58. When Plaintiff's knee pain did not improve, Dr. Stein recommended surgery, which was performed in November 2013. Tr. 493, 511. After Plaintiff underwent PT and only achieved limited improvement, Dr. Stein opined that Plaintiff would have permanent restrictions from her knee impairment precluding her

from kneeling, climbing, squatting, and walking on uneven ground. Tr. 527. He also wrote in his notes that she would need to sit for fifty percent of the workday. Tr. 527. These notes provide support the questionnaire completed by Dr. Stein, which described similar symptoms, clinical findings, and limitations. *See* tr. 579–582.

Second, the ALJ erred in discounting Dr. Stein's opinion because Plaintiff received "generally conservative care" and "never instructed a claimant to limit herself in these ways." As described above, Plaintiff's treatment for her knee impairment was not conservative. *See supra* Part I.C. Plaintiff underwent two knee surgeries and was prescribed narcotic pain medication for her pain. *Id.* And Dr. Stein's treatment notes reflect similar limitations to those described in his report. In one his last few appointments with Plaintiff, he wrote that she would not be able to kneel, climb, and squat; and would need to sit fifty percent of the workday; and avoid walking on uneven ground. Tr. 527. Accordingly, the ALJ's findings are not supported by the record.

Finally, the ALJ erred in giving Dr. Stein's assessment partial weight because of Plaintiff's "considerable activities of daily living." Tr. 28. Again, the ALJ does not explain this finding, and the Court fails to see how Plaintiff's daily activities conflict with an of Dr. Stein's assessed limitations. Plaintiff's ability to drive for short periods of time, cook simple meals, do light housekeeping, water the lawn, and walk for short periods of time on even ground are not inconsistent with the above-described limitations. Indeed, consistent with Dr. Stein's opinion Plaintiff reported that she had difficulty kneeling; climbing stairs; and standing, sitting, or walking for long periods of time. Tr. 238. She also wrote that she is unable to do many of her previous activities, including hiking and dancing. Tr. 242. In sum, the ALJ's reasons for discounting Dr. Stein's opinion are not specific, legitimate, or supported by substantial evidence in the record.

### III.    Step Two

In discussing the opinion evidence from Dr. Mazur and Dr. Kastl, Plaintiff also argues that the ALJ erred at step two by finding Plaintiff's wrist and psychological impairments non-severe. Pl. Br. 5, 10. At step two, the ALJ determines whether the claimant's medically determinable impairment or combination of impairments is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Step two is a *de minimis* screening device used to dispose of groundless claims. *Bowen,* 482 U.S. at 153–54. An impairment is severe if it "significantly limits the claimant's ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "An impairment is not severe if it is merely a 'slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting SSR 96-3p). If the ALJ identifies at least one severe impairment, the analysis proceeds, and the ALJ is to take into account all of the claimant's limitations, regardless of whether they are severe or non-severe. *Howard ex. rel Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (citing 20 C.F.R. § 416.923. Therefore, even if the ALJ fails to identify a severe impairment at step two, the error is harmless so long as he considers all of the claimant's impairments at subsequent steps of the analysis. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Graybeal v. Astrue*, No. 3:10–cv–06387–PK, 2011 WL 6019434, at *6 (D.Or. Nov. 2, 2011) ("An ALJ's erroneous finding that an impairment is non-severe constitutes harmless error, however, if the ALJ resolves step two in the claimant's favor and properly considers limitations imposed by the impairment at other steps of the sequential process.")

At step two, the ALJ found that Plaintiff had one severe impairment: right knee arthropathy. Tr. 23. The ALJ found that Plaintiff's "right carpal tunnel syndrome, tennis elbow,

hypertension, and eye hemorrhage are not considered severe because there is little indication they significantly affect the claimant's ability to perform basic work activities." Tr. 23. She concluded that Plaintiff's anxiety was non-severe and "did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities." Tr. 23. Considering the four areas of mental functioning set out in the regulations, the ALJ determined that Plaintiff had a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself. Tr. 23–24.

Regarding Plaintiff's psychological impairments, the Court finds that the ALJ did not err. Plaintiff's argument on this issue hinges on whether the ALJ erred in her analysis of the opinions of Dr. Kastl and Dr. Sands. Pl. Br. 5–8. Plaintiff does not otherwise argue that the ALJ erred in her analysis of Plaintiff's psychological impairments at step two nor has she identified any improperly discounted limitation from these impairments that was not considered by the ALJ later in her analysis. Accordingly, the Court finds that the ALJ did not err in finding Plaintiff's psychological impairments non-severe.

As to Plaintiff's wrist impairments, however, the ALJ erred. The ALJ failed to address all of Plaintiff's wrist and forearm impairments, finding only that Plaintiff's carpal tunnel and tennis elbow were not severe. Tr. 23. But Dr. Mazur also diagnosed Plaintiff with radial tunnel syndrome, tr. 474, and he opined that her arm impairment had more than a minimal effect on her ability to do basic work activities, tr. 420, 424, 432, 522. The objective medical evidence demonstrated weakness, pain, and tenderness in her wrist and right forearm. Tr. 419, 428, 440, 474. And as noted above, Plaintiff's testimony and the evidence from Dr. Mazur describing Plaintiff's arm limitations—which include limitations in lifting, gripping, pushing, pulling, and

grasping—was improperly rejected. As a result, the ALJ failed to take into account all of

Plaintiff's limitations and erred at step two of the sequential analysis.

## IV.    Step Four

Plaintiff argues that the ALJ erred at step four of the sequential analysis because the RFC

was unsupported by substantial evidence and the ALJ erred in finding that Plaintiff could

perform her past relevant work. Pl. Br. 10–12. The residual functional capacity (RFC) is the most

a person can do, despite his physical or mental limitations. 20 C.F.R. §§ 404.1545, 416.945. In

formulating an RFC, the ALJ must consider all medically determinable impairments, including

those that are not "severe," and evaluate "all of the relevant medical and other evidence,

including the claimant's testimony." *Id.*; SSR 96-8p.  At step four, the ALJ determines whether

the claimant can perform past relevant work given their RFC. 20 C.F.R. §§ 404.1520(e),

416.920(e). If the claimant can perform past relevant work as it was actually performed *or* as it is

generally performed in the national economy, the claimant is not disabled within the meaning of

the Act, thus concluding the sequential evaluation process. *See, e.g.*, *Tommasetti,* 533 F.3d at

1042–43; SSR 82-61.  The ALJ may use two different sources of information to define how a

claimant's past relevant work is actually performed: "a properly completed vocational report . . .

and the claimant's own testimony." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (citing

SSR 82-61, SSR 82-41).

Because the ALJ erred in discounting Plaintiff's subjective symptom testimony as to her

physical impairments and discounting the opinions of Dr. Mazur and Dr. Stein, the ALJ's RFC

determination is not supported by substantial evidence. Plaintiff's testimony and the opinion

evidence include limitations that were not included in the RFC relied on by the ALJ to conclude

that Plaintiff was not disabled. Specifically, Plaintiff stated, among other things, that she could

only lift fifteen pounds, needed to rest for fifteen to twenty minutes after doing light

housekeeping, and has difficulty using her arms. Tr. 55, 238. Dr. Stein wrote that Plaintiff's pain

would interfere with her attention and concentration; that Plaintiff would not be able to sit, stand,

or walk for more than two hours in an eight-hour workday; and that Plaintiff could never stoop

or squat. Tr. 580–82. Dr. Mazur opined that Plaintiff had various lifting, gripping, pushing, and

pulling limitations. Tr. 420, 452, 522. But these limitations were not included in the RFC, which

only limited Plaintiff to sitting for fifty percent of the workday; never climbing ramps, stairs,

ladders, ropes, or scaffolds; frequently balancing; occasionally stooping and crawling; never

kneeling or crouching; and avoiding uneven ground. Tr. 24. Accordingly, the ALJ's RFC is not

supported by substantial evidence, and the ALJ erred at step four of the sequential analysis.

## V.     Remand

Plaintiff asks the Court to credit the above-described testimony as true and remand this

case for payment of benefits of for further proceedings. Pl. Br. 13. To determine which type of

remand is appropriate, the Ninth Circuit uses a three-part test. *Garrison v. Colvin,* 759 F.3d 995,

1020 (9th Cir. 2014); *Treichler v. Comm'r Soc. Sec. Admin.,* 775 F.3d 1090, 1100 (9th Cir.

2014). First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence,

whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record

must be fully developed, and further administrative proceedings would serve no useful

purpose. *Id.* Third, if the Court remands the case and credits the improperly discredited evidence

as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of

benefits, each part must be satisfied. *Id.* The "ordinary remand rule" is "the proper course,"

except in rare circumstances. *Treichler*, 775 F.3d at 1101.

The Court finds that the ordinary remand rule is the proper course in this case. While the VE concluded that Plaintiff would be unable to perform her past relevant work if she was limited to standing and walking less than two hours in an eight-hour day and sitting for two hours in an eight-hour day, tr. 64, the improperly-discredited testimony described above does not necessarily support these limitations. For example, Dr. Stein opined in his questionnaire that Plaintiff would be limited to walking less than two hours and sitting for two hours in an eight-hour day, but his treatment notes state that Plaintiff is limited to sitting fifty percent of the time. *Compare* tr. 581 (opining plaintiff could only sit for two hours in an eight-hour day) *with* tr. 551 (writing Plaintiff needs to sit for fifty percent of the workday). While not inherently inconsistent, it does present an ambiguity as to the extent of Plaintiff's sitting limitation. In addition, none of the hypotheticals presented to the VE include the limitations described by Dr. Mazur. Accordingly, the Court remands this case for further administrative proceedings.

## CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED for further administrative proceedings.

IT IS SO ORDERED.


DATED:____March 24, 2021_____.

_____
MARCO A. HERNÁNDEZ
United States District Judge